MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> USA WASTE OF CALIFORNIA, INC., a Delaware corporation, <br><br> Defendant. | Civil Case No.   **'20 CV 0233 JLS  WVG** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). See 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On September 20, 2019, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant USA Waste of California, Inc. as owner and operator of the El Cajon Hauling, Transfer, and Recycling Facility located at 1001 West Bradley Avenue, El Cajon, California 92020 ("El Cajon Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letters to the registered agents for Defendant and Defendant's parent company, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letters were served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is

1 | diligently prosecuting an action to redress the violations alleged in the Notice Letters and
2 | in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior
3 | administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4 |     5.    Venue is proper in the Southern District of California pursuant to Section
5 | 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are
6 | located within this judicial district.

## II.    __INTRODUCTION__

8 |     6.    Plaintiffs seek relief for Defendant's substantive and procedural violations
9 | of the General Industrial Permit and the Clean Water Act resulting from Defendant's
10 | activities at the El Cajon Facility.

11 |     7.    Specifically, Defendant has discharged and/or continues to discharge
12 | polluted storm water from the El Cajon Facility to downstream waters and groundwater
13 | including Forester Creek, the San Diego River, and the Pacific Ocean (collectively
14 | "Receiving Waters") in violation of the express terms and conditions of Sections 301 and
15 | 402 of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

16 |     8.    Defendant has also violated and continues to violate the filing, monitoring,
17 | reporting, discharge and management practice requirements, and other procedural and
18 | substantive requirements of the General Industrial Permit.

19 |     9.    This complaint further seeks relief to prevent discharges in violation of the
20 | General Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit").
21 | These are ongoing and continuous violations of the Clean Water Act and the General
22 | Industrial Permit.

23 |     10.    With every rainfall event, hundreds of millions of gallons of polluted
24 | rainwater, originating from industrial facilities like those conducted at the El Cajon
25 | Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

26 |     11.    Among the Receiving Waters are ecologically sensitive areas providing
27 | essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as
28 | well as vital macro- and micro-invertebrate species which are an important link in the

food web between the producers (leaves, algae) and higher consumers such as fish.

12.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13.     Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.     The polluted discharges from the El Cajon Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use of the Receiving Waters for water contact recreation exposes people to bacteria, toxic metals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

15.     Plaintiffs seek declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

**III.     PARTIES**

**A.     Plaintiffs.**

16.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

17.     San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San

Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State, and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

18.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas, California 92024.

19.     CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

20.     Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters.  Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

21.     Defendant's failure to comply with the procedural and substantive requirements of the General Industrial Permit and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.     The violations of the General Industrial Permit and Clean Water Act at the El Cajon Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's failure to

comply with the General Industrial Permit and the Clean Water Act.

23.   The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B.   The Owner and/or Operator of the El Cajon Facility.**

24.    Plaintiffs are informed and believe that USA Waste of California, Inc. is an active Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

25.   Information available to Plaintiffs indicates that USA Waste of California, Inc. is a subsidiary of Waste Management, Inc.

26.   Plaintiffs are informed, believe, and thereon allege, based on representations from Counsel for Defendant, that USA Waste of California, Inc. is the Owner and/or Operator of the Facility.

**IV.   LEGAL BACKGROUND**

**A.   The Clean Water Act.**

27.   The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

28.   Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

29.   "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

30.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.

31.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

32.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *Rapanos v. United States*, 547 U.S. 715 (2006); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

33.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999–00.

34.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000–01.

35.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)–(iii).

36.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an

"effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

37.     A corporate entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

38.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

39.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

40.     Section 505(d) of the Clean Water Act permits prevailing, or substantially prevailing parties, to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.     California's General Industrial Permit.**

41.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

42.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

43.     California is a state authorized by the EPA to issue NPDES permits.

44.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

45.     The General Industrial Permit is a statewide general NPDES permit issued

by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

46. Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

47. On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

48. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

49. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Industrial Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

50. Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.      The General Industrial Permit Discharge Prohibitions.**

51. The General Industrial Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 Permit § III.A.

52. The Discharge Prohibitions provisions prohibit the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B.

53.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

54.     The General Industrial Permit prohibits "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies." 2015 Permit § III.D.

55.     The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions. Basin Plan at 4-19.

56.     Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." *Id*. at 4-20.

57.     Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

58.     Each and every time a Facility Owner and/or Operator discharges unauthorized non-storm water from the Facility is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.1; 2015 Permit § III.B.

59.     Each and every time a Facility Owner and/or Operator discharges storm water or authorized non-storm water which causes or threatens to cause pollution, contamination, or nuisance is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.2; 2015 Permit § III.C.

60.     Each and every time a Facility Owner and/or Operator discharges storm water or authorized non-storm water that violates any discharge prohibitions contained in applicable Basin Plans or statewide water quality control plans and policies is a violation

of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 2015 Permit § III.D.

**D.     The General Industrial Permit Effluent Limitations.**

61.     The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 Permit § V.A.

62.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

63.     Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

64.     The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

65.     The EPA Benchmarks provide a relevant and objective standard for evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766−67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 50; EPA 2008 MSGP Fact Sheet at 106.

66.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional

pollutants. *Id.*

67.     The EPA Benchmark for TSS is 100 mg/L. 2015 MSGP Fact Sheet at 55–56.

68.     The EPA Benchmark for total zinc in freshwater is 0.12 mg/L. *Id.*

69.     The EPA Benchmark for total copper in freshwater is 0.014 mg/L. *Id.*

70.     The EPA Benchmark for oil and grease is 15 mg/L. *Id.*

71.     The EPA Benchmark for total iron in freshwater is 1.0 mg/L. *Id.*

72.     The EPA Benchmark for total aluminum is 0.75 mg/L. *Id.*

73.     The EPA Benchmark for nitrate + nitrite nitrogen (N+N) is 0.68 mg/L. *Id.*

74.     The EPA Benchmark for total phosphorus in freshwater is 2.0 mg/L. *Id.*

75.     The EPA Benchmark for pH is 6.0–9.0 s.u. *Id.*

76.     The EPA Benchmark for total lead in freshwater is 0.082 mg/L. *Id.*

77.     Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

78.     Each time a Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**E.     The General Industrial Permit Receiving Water Limitations.**

79.     The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

80.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

81.     The General Industrial Permit Receiving Water Limitation prohibits storm

water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

82.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

83.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

84.     WQSs applicable to dischargers covered by the General Industrial Permit include, but are not limited to, those set out in the Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

85.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

86.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

87.     The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation. *Id.*

88.     The Beneficial Uses of the San Diego River downstream of the confluence of Forester Creek include: Contact Water Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Rare, Threatened, or Endangered Species; Agricultural Supply; and

Industrial Service Supply. Basin Plan at Table 2-3.

89.    The Beneficial Uses of Forester Creek include: Contact Water Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Industrial Service Supply; and Potential Municipal Supply. *Id.*

90.    The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply; Navigation; Contact Water Recreation; Non-Contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Marine Habitat; Migration of Aquatic Organism; Spawning Reproduction, and/or Early Development; Shell Harvesting; Aqua Culture; and Rare, Threatened, or Endangered Species. *Id.*

91.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

92.    According to the 2016 303(d) List of Impaired Water Bodies, the lower reach of the San Diego River is impaired for benthic community effects, cadmium, indicator bacteria (enterococcus), nitrogen, low dissolved oxygen, phosphorus, total dissolved solids ("TDS"), and toxicity.

93.    According to the 2016 303(d) List of Impaired Water Bodies, Forester Creek is impaired for benthic community effects, indicator bacteria (including E. Coli, fecal coliform, and total coliform), nitrogen, phosphorus, selenium, and TDS.

94.    According to the 2016 303(d) List of Impaired Water Bodies, the Pacific Ocean shoreline at the San Diego River outlet is impaired for indicator bacteria, such as enterococcus and total coliform.

95.    Polluted discharges from industrial facilities, such as the El Cajon Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

96.    The Basin Plan sets forth WQSs for surface waters and enclosed bays and estuaries for various pollutants.

97. The Basin Plan Objective for total iron is 1.0 mg/L for the San Diego River in hydrological subunit 907.11. Basin Plan, Table 3-2.

98. The Basin Plan Objective for inland surface waters for total phosphorus is 0.1 mg/L. *Id.*

99. The Basin Plan Objective for inland surface waters for total nitrogen is 1.0 mg/L. *Id.*

100. The Basin Plan Objective for pH states that inland surface water "shall not be depressed below 6.5 or raised above 8.5." *Id.* at 3-26.

101. From July 1, 2015, to March 21, 2019, the Basin Plan Water Quality Objective for inland surface waters for fecal coliform was 400 MPN/100 ml, and for enterococcus was 61 MPN/100 ml.

102. Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 320 cfu/100mL for E. coli in all waters where the salinity is equal to or less than 1 ppth 95 percent or more of the time. State Water Resources Control Board, Part 3 of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bays, and Estuaries of California § III.E.2.

103. Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 110 cfu/100mL for enterococci in all waters where the salinity is greater than 1 ppth more than five percent of the time. *Id*.

104. From July 1, 2015, to March 21, 2019, the Water Quality Control Plan for Ocean Waters of California ("Ocean Plan") set the single sample maximum for fecal coliform density at 400 per 100mL, and single sample maximum for enterococcus density at 104 per 100 mL. Ocean Plan § II.B.1.(1).

105. Since March 22, 2019, the applicable Water Quality Objective for indicator bacteria in Ocean Waters is 110 cfu/100mL for enterococci. State Water Resources Control Board, Amendment to the Water Quality Control Plan for Ocean Waters of

California § II.B.1.(1).

106.   The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

107.   The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

108.   The CTR sets forth the maximum concentrations for freshwater inland surface waters, based on 100mg/L hardness. For example, lead is 0.065 mg/L; zinc is 0.12 mg/L; and copper is 0.013 mg/L. 40 C.F.R. § 131.38.

109.   The CTR sets forth the maximum concentrations for saltwater bays and estuaries. For example, lead is 0.21 mg/L; zinc is 0.09 mg/L; and copper is 0.0048 mg/L. 40 C.F.R. § 131.38.

110.   Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

111.   In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone." 65 F.R. § 31682-01, 31701.

112.   Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

113.   Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. *See* 1997

Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

114.    "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.'" *Natural Resources Defense Council, Inc.* ("*NRDC*") *v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (quoting 40 C.F.R. § 122.41(a)).

115.    The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

116.    Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**F.      The General Industrial Permit Storm Water Pollution Prevention Plan Requirements.**

117.    Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A–B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015, or upon commencement of industrial activity.

118.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water

from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

119.   The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

120.   The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

121.   The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

122.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1–10; 2015 Permit §§ X.A–I.

123.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§ A.9–10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30

days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

124.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a–c; 2015 Permit § XV.

125.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i–vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

126.   The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3–4; 2015 Permit §§ I.J.55, X.B.1.

**G.     The General Industrial Permit Monitoring and Reporting Requirements.**

127.   The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1–2, E.3; 2015 Permit, §§ X.I, XI.1.

---

[1] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

128.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a–b; 2015 Permit §§ X.I, XI.

129.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

130.    The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

131.    The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

132.    The General Industrial Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

133.    Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

134.    The General Industrial Permit requires dischargers to revise the M&RP as

necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

135.   The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

136.   The 1997 Permit defines Wet Season as October 1 through May 30. 1997 Permit, Section B.4.a.

137.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

138.   Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that were preceded by at least three (3) working days without storm water discharge.

139.   Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

140.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

141.   The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

142.   Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting

Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

143.    Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

144.    Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

145.    Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

146.    Section XI.B.6.a–b of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

147.    Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

148.    Section XI.B.6 of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

149.    Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

150.    Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

151.    Section XVI of the 2015 requires dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

152.    The General Industrial Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

153.    The General Industrial Permit requires that signatories under Sections C.9–10 of the 1997 Permit, and Sections XX.K–L of the 2015 Permit, to make the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## V.    FACTUAL BACKGROUND

### A.    Facility Site Information, Industrial Activities, and Pollutant Sources.

154.   The El Cajon Facility first obtained General Industrial Permit coverage to conduct industrial operations at the Facility on January 16, 1996.

155.   The Facility submitted its most recent Notice of Intent ("NOI") to the State Board to obtain General Industrial Permit coverage for the Facility on June 1, 2015 ("2015 NOI"), under Waste Discharge Identification ("WDID") Number 9 37I012089, and identifies both the Facility site name and Facility operator as "Universal Refuse Removal."

156.   The 2015 SWPPP was prepared for "Waste Management of San Diego – El Cajon Hauling, Transfer, and Recycling Facility," and states that "[t]he facility is a hauling, transfer, and recycling facility *operated* by Waste Management." 2015 SWPPP § 4.0 (emphasis added). However, in-house counsel for the Facility has stated that the correct legal entity for the site is USA Waste of California, Inc.

157.   The 2015 NOI states the El Cajon Facility is approximately 13.5 acres. The NOI further identifies 10 of these acres as exposed to storm water and claims only five percent of the site is impervious. *Id.* However, the 2015 El Cajon SWPPP states that 99% of the site is impervious.

158.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility is currently an active industrial facility covered under the General Industrial Permit.

159.   The 2015 El Cajon Facility SWPPP lists the primary Standard Industrial Classifications ("SIC") code for the Facility as 4212 "Local Trucking Without Storage," 4214 "Local Trucking with Storage" as the secondary SIC code, and 5093 "Scrap and Waste Materials" as a tertiary SIC code.

160.   The Owners and/or Operators of the El Cajon Facility describe the Facility as a "a hauling, transfer, and recycling facility." 2015 El Cajon SWPPP § 4.0. According to the 2015 El Cajon SWPPP, "Waste Management uses the facility primarily to store and repair collection vehicles and bins, fuel collection vehicles, wash bins, operate a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    23

recyclables buyback and household hazardous waste center, and conduct [municipal solid waste ("MSW")] and recyclables transfer operations." *Id.*

161.   The 2015 El Cajon SWPPP identifies numerous industrial materials that are stored, handled, or processed at the facility, including "MSW, source separated co-mingled recyclable materials, household hazardous waste, petroleum products, universal waste, [LNG], [CNG], and hazardous materials associated with vehicle and bin maintenance and bin painting." *Id.* § 4.1. The SWPPP clarifies that source separated co-mingled recyclable materials consist of "paper, cardboard, aluminum, glass, and plastics." The recyclables buy-back and household hazardous waste drop-off center receives the comingled recyclables above, as well as used oil and filters, vehicle batteries, and electronic waste. *Id.* § 4.1.1.

162.   According to the Facility's SWPPP, materials used in the Facility's maintenance operations include antifreeze, waste coolant, lubricant, transmission fluid, hydraulic fluid, batteries, and diesel fuel. *Id.* § 4.1.2, Table 2.

163.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the El Cajon Facility also include the operation of misters used for odor control purposes. *Id.*

164.   According to the 2015 El Cajon Facility SWPPP, the "primary potential sources of pollutants at the facility include industrial processes and industrial materials," and that the "most likely sources of stormwater pollutants are industrial processes that result in the release of dust and particles, oil and grease, and organics." 2015 El Cajon SWPPP §§ 4.0, 4.2.

165.   Plaintiffs are informed, believe, and thereon allege that "organics" may refer to organic materials such as food waste, yard trimmings, soiled paper, and wood waste, or to synthetic organic compounds used in a variety of industrial and manufacturing materials including paint, adhesives, cleaners, solvents, sealants, pharmaceuticals, etc.

166.   The SWPPP further acknowledges the following pollutant sources at the Facility: "materials in the Transfer Building can migrate outside when the vehicles are

loading or unloading because of wind or track-out and may be exposed to stormwater" (*id.* § 4.1.1); "the buy-back center is not under cover and is exposed to stormwater; therefore, paper, cardboard, aluminum, plastic, and glass debris may be exposed to stormwater" (*id.*); and "loading activities for household hazardous wastes and e-wastes are not conducted under cover and are potentially exposed to stormwater" (*id.* § 4.1.3).

167.   Plaintiffs are informed, believe, and thereon allege that the waste and recycling streams identified in the previous paragraph typically include pollutants such as pathogens and bacteria, nutrients, toxic metals, and other potentially toxic substances.

168.   Inspections records for the El Cajon Facility indicate that the Facility handles significant quantities of MSW, green waste, e-waste, and other mixed recyclables. These inspection reports have also identified debris associated with MWS and recyclable transfer operations scattered about the Facility.

169.   Plaintiffs are informed, believe, and thereon allege that waste hauling vehicles, bins, and containers are waste handling equipment which regularly come into contact with MSW, green waste, e-waste, and other mixed recyclables.

170.   Plaintiffs are informed, believe, and thereon allege that waste hauling vehicles, bins, and containers that have handled MSW, green waste, e-waste, and other mixed recyclables are moved throughout the El Cajon Facility for cleaning, maintenance, and storage.

171.   Plaintiffs are informed, believe, and thereon allege that waste hauling vehicles, bins, and containers that have handled MSW, green waste, e-waste, and other mixed recyclables are stored in various areas throughout the Facility, outdoors, and exposed to storm water.

172.   Inspection records for the El Cajon Facility indicate persistent bird droppings near the transfer bay.

173.   Plaintiffs are informed, believe, and thereon allege that bird droppings can harbor human pathogens.

174.   Plaintiffs are informed, believe, and thereon allege e-waste contains high

levels of toxic materials such as lead, mercury, cadmium and arsenic, which can leach into the environment, and when mishandled, can lead to irreversible health effects, including cancers, miscarriages, neurological damage and diminished IQs.

175. Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked and dispersed throughout the entire site.

176. Plaintiffs are informed, believe, and thereon allege that many of the industrial activities conducted at the Facility occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the facility.

177. Plaintiffs are informed, believe, and thereon allege that many pollutants associated with the industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

178. Plaintiffs are informed, believe, and thereon allege that the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind or otherwise throughout the entire site, and on and off the Facility through ingress and egress. This results in tracking and dispersal of trash, pathogens, nutrient pollutants, sediment, dirt, O&G, metal particles, and other pollutants throughout the site, and off-site.

179. Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires General Industrial Permit coverage.

180. Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, no adequate BMPs or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the

regulated industrial activities.

181.   Plaintiffs are informed, believe, and thereon allege that storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and thus all storm water discharges from the Facility are regulated under the General Industrial Permit.

182.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the El Cajon Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

183.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of non-storm water in violation of the General Industrial Permit and the Clean Water Act.

184.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the General Industrial Permit.

185.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit.

186.   Plaintiffs are informed, believe, and thereon allege that elevated levels of metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

187.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the El Cajon Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.      Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

188.   According to the 2015 El Cajon SWPPP, the Facility consists of twelve industrial storm water discharge locations and one non-industrial discharge location. *Id*. § 8.1.

189.   According to the 2015 El Cajon SWPPP, storm water in the northeastern drainage area of the Facility discharges at SW-1. The drainage area discharging to SW-1 contains portions of the Transfer Building where transfer and construction and demolition ("C&D") debris tipping operations take place, part of the collection vehicle driveway, and the concrete storage area. The SWPPP states storm water in this drainage area flows to one of two catch basins, and then a bioswale, and thereafter discharges to the southern curb of West Bradley Avenue. *Id.* § 3.3.

190.   According to the 2015 El Cajon SWPPP, discharge point SW-2 "accepts water from the eastern portion of Maintenance Building 1, the scale house area, the area between Maintenance Building 1 and the Transfer Building, and from the vehicle diesel fueling area." The SWPPP states that SW-2 is fitted with silt sifters, and storm water thereafter discharges directly into Forester Creek. *Id.*

191.   According to the 2015 El Cajon SWPPP, storm water from the "collection vehicle driveway, eastern and southern portions of the Transfer Building, and the site buy-back and household hazardous waste drop-off center discharge into SW-3." The SWPPP and site map indicate that water from this drainage area flows to one of three drain inlets fitted with a filtering metal grate and is thereafter discharged directly into Forester Creek." *Id.*

192.   According to the Facility SWPPP, discharge point SW-4 collects water "from the eastern portion of Maintenance Building 2 (the bin welding/painting/repair portion of the building), the southern area of the bridge that spans Forester Creek, and the eastern portion of the collection vehicle parking area." The SWPPP and site map indicate that water from this drainage area flows to a drain inlet fitted with a metal grate. *Id.*

193.   According to the Facility SWPPP, discharge point SW-5 "collects

stormwater from the bin storage areas, the western portion of Maintenance Building 2 (hazardous material storage area), bin wash rack area, and a portion of the collection vehicle parking area." The SWPPP notes that SW-5 is fitted with a series of blocks, as well as silt sifters and a filtering metal grate. *Id*.

194.   According to the 2015 El Cajon SWPPP, discharge point SW-7 "collects water from the southern portion of the employee vehicle parking area and the western corner of the equipment and parts storage area." The SWPPP states that water from this area is filtered through silt sifters and a filtering metal grate before being discharged directly into Forester Creek. *Id.*

195.   According to the 2015 El Cajon SWPPP, discharge point SW-8 "collects water from the bin and container storage area." The SWPPP states that water from this area flows through a metal grate before being discharged directly to Forester Creek. *Id.*

196.   According to the 2015 El Cajon SWPPP, discharge point SW-9 "collects water from the western portion of the bin and container storage area and the collection vehicle parking area. Stormwater at this location overland flows off-site to North Marshall Avenue." *Id.*

197.   According to the 2015 El Cajon SWPPP, discharge point SW-10 "collects water from the southwestern portion of the collection vehicle parking area. Stormwater at this location overland flows off-site to North Marshall Avenue." *Id.*

198.   According to the 2015 El Cajon SWPPP, discharge point SW-11 "collects water from the LNG/CNG tank and fueling area and eastern corner of the collection vehicle parking area. Stormwater flows to a filtering metal grate and silt sifters then through a vegetated area and directly discharges to Forester Creek." *Id.*

199.   According to the 2015 El Cajon SWPPP, storm water collected in a V-ditch that runs along the landscaped portion near the collection vehicle parking area on the southern boundary of the facility discharges directly in Forester Creek. The SWPPP notes that "this discharge location does not commingle with industrial activities and as a result does not need to be monitored." *Id.*

200.   According to the 2015 El Cajon SWPPP, an unnamed discharge point on the northern boundary of the facility "collects water from the northern portion of the employee vehicle parking area." The SWPPP states that water in this area "does not commingle with industrial activities and as a result does not need to be monitored." *Id.*

201.   However, the site map indicates there is another drain inlet within this drainage area located in the industrial area between Maintenance Building 1 and the Transfer Building, indicating that this drainage area receives storm water from both non-industrial and industrial areas of the Facility. As such, storm water and non-storm water discharged from this drainage area could comingle and should be monitored.

**C.    The El Cajon Facility Discharges Contaminated Storm Water in Violation of the General Industrial Permit.**

202.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the El Cajon Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

203.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the El Cajon Facility Owner and/or Operator discharges polluted storm water are waters of the United States and therefore the General Industrial Permit properly regulates discharges to those waters.

204.   Plaintiffs are informed, believe, and thereon allege that storm water discharges from the El Cajon Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the General Industrial Permit.

**1.    Discharges of Polluted Storm Water from the El Cajon Facility Violate General Industrial Permit Discharge Prohibitions.**

205.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has discharged and continues to discharge storm water and non-storm water in violation of various absolute prohibitions enumerated in the General Industrial Permit.

206.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility has discharged unauthorized non-storm water discharges ("NSWD") in violation of the

General Industrial Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, the Facility SWPPP notes that "[c]ondensate is generated in the LNG/CNG AST area on the southeastern portion of the facility," and that "[i]f excessive amounts of condensate forms, the water will drain towards the pump located on the northeastern corner of the bunker, which pumps water to the ground level and can potentially flow to outfall location SW-12." 2015 SWPPP § 4.5. SW-12 is not labeled or mentioned in the Facility SWPPP or site map.

207.   Multiple Facility inspections also reference the operation of misters used for odor control purposes. For example, an inspection conducted on September 25, 2018, noted that "a puddle was observed and appeared to have formed from a clogged misting head resulting in a narrow stream dispersion of water (Photo 1)." The Facility SWPPP fails to acknowledge the use of misters at the Facility.

208.   NSWDs resulting from condensate and misters are not from sources listed among the authorized NSWDs in the special conditions section of the Storm Water Permit, and are thus always prohibited. 1997 Permit § A.1; 2015 Permit § III.B. Therefore, any and all such NSWDs from the Facility are expressly illegal.

209.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility Owner and/or Operator has failed to develop and/or implement BMPs that would prevent these NSWD from comingling and/or discharging from the Facility in violation of the General Industrial Permit.

210.   Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since September 20, 2014.

211.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has discharged and continues to discharge numerous pollutants in concentrations that

cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit.

212.   For example, storm water monitoring data collected at the Facility on May 16, 2019, at or near SW-1 indicates that storm water at the Facility contains high concentrations of aluminum, copper, iron, lead, zinc, N+N, phosphorus, total coliform, fecal coliform, and enterococcus. *See* Ex. 1.

213.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has discharged and continues to discharge many of these pollutants in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

214.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has discharged storm water with pollutant concentrations that violate discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies in violation of Discharge Prohibition III.D of the 2015 Permit.

215.   For example, the San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

216.   Plaintiffs are informed, believe, and thereon allege the Facility's own storm water monitoring data shows numerous instances of high TSS concentrations, which adversely affects the beneficial uses of Receiving Waters.

217.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the El Cajon Facility's discharges, or to the downstream Receiving Waters.

218.   As such, the analytical results of storm water sampling at the Facility demonstrate that the El Cajon Facility Owner and/or Operator has violated and continues

to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan.

219.   Each time the El Cajon Facility discharges polluted storm water in violation of Sections III.C or III.D of the Discharge Prohibitions provisions of the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

220.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

## 2.  Discharges of Polluted Storm Water from the El Cajon Facility Violate General Industrial Permit Effluent Limitations.

221.   Plaintiffs are informed, believe, and thereon allege that the Facility has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A. For example, storm water samples collected by the Facility on February 27, 2018, January 9, 2018, January 23, 2017, and December 16, 2016, reflected TSS concentrations above the EPA Benchmark for TSS of 100 mg/L. *See* Ex. 1; *see also* MSGP Fact Sheet at 55–56.

222.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator likely discharges numerous additional pollutants in excess of EPA Benchmarks.

223.   The Facility Owner and/or Operator failed to analyze storm water discharged from the Facility for numerous pollutants other than TSS, O&G, and pH prior to December 4, 2019. For example, storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1 indicates that storm water at the Facility contains high concentrations of aluminum, copper, iron, lead, zinc, N+N, phosphorus, TSS, O&G, total coliform, fecal coliform, e. coli, and enterococcus. However, the Facility Owner and/or Operator failed to analyze samples for any of these

additional parameters until after receipt of the Notice Letters from Plaintiffs. Even after engagement with Plaintiffs, the Facility Owner and/or Operator has never sampled for aluminum, iron, total coliform, fecal coliform, e. coli, and enterococcus.

224.   The 2015 El Cajon SWPPP fails to acknowledge that aluminum, copper, iron, lead, zinc, N+N, phosphorus, total coliform, fecal coliform, e. coli, and enterococcus are present at the Facility, and as a result, the Facility Owner and/or Operator fails to analyze storm water samples for any of these pollutants.

225.   Plaintiffs thereon allege that the Facility has discharged, and continues to discharge TSS, aluminum, copper, iron, lead, zinc, N+N, and phosphorus in excess of EPA Benchmarks.

226.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility's exceedances of EPA Benchmarks indicate the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

227.   Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

228.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since September 20, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since September 20, 2014.

### 3.  Discharges of Polluted Storm Water from the El Cajon Facility Violate General Industrial Permit Receiving Water Limitations.

229.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility

has violated and continues to violate General Industrial Permit Receiving Water Limitations during every significant rain event. For example, the Facility's own storm water monitoring data shows numerous instances of high TSS concentrations.

230.   The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

231.   According to the 2016 303(d) List of Impaired Water Bodies, Forester Creek and the San Diego River are impaired for benthic community effects and are thus unable to support their designated Beneficial Uses.

232.   The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

233.   Plaintiffs are informed, believe, and thereon allege that the Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective cause and/or contribute to the benthic community effects impairments of Forester Creek and the San Diego River in violation of the Receiving Water Limitations of the General Industrial Permit.

234.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged, and continues to discharge elevated concentrations of indicator bacteria such as fecal coliform, E. Coli, and enterococcus in excess of the Basin Plan Objectives. For example, storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1 showed concentrations of total coliform, fecal coliform, and enterococcus at 1,600,000 MPN/100ml present at the Facility.

235.   From July 1, 2015, to March 21, 2019, the Basin Plan Water Quality Objective for fecal coliform was 400 MPN/100 ml, and for enterococcus was 61 MPN/100 ml. Since March 22, 2019, the applicable Basin Plan Water Quality Objective

for indicator bacteria is 320 cfu/100mL for E. coli.

236.    Storm water present at the Facility contained indicator bacteria in concentrations multiple orders of magnitude higher that the Basin Plan water quality objectives, indicating that storm water discharged from the Facility would contain levels of indicator bacteria significantly in excess of the Basin Plan objectives.

237.    Plaintiffs are informed, believe, and thereon allege that the Facility has discharged, and continues to discharge, elevated concentrations of nutrients such as nitrogen and phosphorus. For example, storm water monitoring data for samples collected from the Facility's impervious surface on May 16, 2019, at or near SW-1, showed concentrations of N+N at 1.24 mg/L and phosphorus at 9.12 mg/L.

238.    The Basin Plan Water Quality Objective for nitrogen is 1.0 mg/L.

239.    The Basin Plan Water Quality Objective for phosphorus is 0.1 mg/L.

240.    According to the 2016 303(d) List of Impaired Water Bodies, both Forester Creek and the lower reach of the San Diego River are impaired for indicator bacteria, nitrogen, and phosphorus.

241.    Plaintiffs are informed, believe, and thereon allege that the Facility has discharged, and continues to discharge, indicator bacteria, nitrogen, and phosphorus in excess of the Basin Plan Water Quality Objectives, and that such discharges cause and/or contribute to the indicator bacteria, nitrogen, and phosphorus impairments of the Receiving Waters.

242.    Plaintiffs are informed, believe, and thereon allege that the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards. For example, storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1, showed concentrations of copper at 0.358 mg/L, lead at 0.157 mg/L, and zinc at 3.12 mg/L present at the Facility.

243.    The CTR standard for copper is 0.013 mg/L.

244.    The CTR standard for zinc is 0.12 mg/L.

245.    The CTR standard for lead is 0.065 mg/L.

246.   According to the 2016 303(d) List of Impaired Water Bodies, the San Diego River is impaired for toxicity and is thus unable to support its designated Beneficial Uses.

247.   Zinc, lead, and copper are considered toxic pollutants, and limitations on zinc, lead, and copper are specifically enumerated in the CTR. 40 C.F.R. § 131.38.

248.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged, and continues to discharge, copper, zinc, and lead in excess of CTR standards, and that such discharges cause and/or contribute to the toxicity impairment of Receiving Waters.

249.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the El Cajon Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality standard], including the CTR").

250.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the El Cajon Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

251.   Each time the El Cajon Facility Owner and/or Operator discharges polluted storm water in violation of the General Industrial Permit's Receiving Water Limitations is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

252.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Industrial Permit's Receiving Water Limitations.

253.   Plaintiffs are informed, believe, and thereon allege that the Facility has been

in violation since September 20, 2014, and Plaintiffs will update the dates of violation when additional information and data becomes available.

254.   Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since September 20, 2014.

**D.   The El Cajon Facility Owner and/or Operator Has Violated and Continues to Violate General Industrial Permit SWPPP Requirements.**

255.   The El Cajon Facility SWPPP, dated June 29, 2015 ("2015 El Cajon SWPPP"), was uploaded to the SMARTS database by the El Cajon Facility Owner and/or Operator.

256.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has not revised the Facility SWPPP at any time, and the 2015 El Cajon SWPPP is the current SWPPP that covers operations at the El Cajon Facility.

257.   Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

258.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility fails to identify the proper SIC codes that apply to the Facility's multiple industrial operations. For example, the Facility's MSW hauling vehicle and equipment maintenance, and the storage of such hauling vehicles and other waste hauling equipment at the Facility indicates that SIC code 4231 "Terminal and Joint Terminal Maintenance Facilities for Motor Freight Transportation" applies to the Facility. The Facility's waste and recycling transfer operations indicate that SIC code 4953 "Refuse Systems" also applies to the Facility's industrial operations. However, the 2015 SWPPP fails to identify either 4231 or 4953 as SIC codes applicable to the Facility.

259.   Plaintiffs are informed, believe, and thereon allege that the 2015 El Cajon SWPPP fails to identify all activities pertaining to the Facility's industrial activities. For example, multiple Facility inspections reference the operation of misters used for odor control purposes, yet the Facility SWPPP fails to acknowledge the use of misters at the

1  Facility.

2       260.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP

3  and site map have failed to accurately identify, label, and describe all industrial activities

4  and pollutant control measures at the Facility in violation of the Storm Water Permit.

5  *See, e.g.*, 2015 Permit, §§ X.E.3.c, X.G.

6       261.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility

7  Owner and/or Operator has failed and continues to fail to develop and/or implement a

8  SWPPP that includes an adequate pollutant source assessment in violation of the General

9  Industrial Permit.

10       262.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the

11  SWPPP includes a *narrative* assessment of all areas of industrial activity with potential

12  industrial pollutant sources." (emphasis added). This assessment shall include "pollutants

13  likely to be present in industrial storm water discharges and authorized [Non-storm water

14  discharges ("NSWDs")] ," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated

15  with those materials may be exposed to, and mobilized by contact with, storm water,"

16  (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to

17  storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing

18  BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized

19  NSWDs," (§ X.G.2.a.vii), among other requirements.

20       263.   Plaintiffs are informed, believe, and thereon allege the Facility SWPPP fails

21  to include any of the aforementioned elements required by Section X.G.2 of the 2015

22  Permit.

23       264.   Plaintiffs are informed, believe, and thereon allege that the 2015 El Cajon

24  SWPPP has failed and continues to fail to adequately and/or accurately identify, describe,

25  and assess all potential pollutants at the Facility related to industrial activities. For

26  example, throughout the 2015 SWPPP's description of all industrial process, the SWPPP

27  identifies only TSS and O&G as "[p]otential pollutants of concern from recycling

28  processes" and "maintenance activities." 2015 El Cajon SWPPP §§ 4.2.1–2. The SWPPP

fails to identify any potential pollutants associated with any other industrial activity.

265.   The 2015 SWPPP's "Pollutant Source Assessment" claims that "[t]here are no known industrial pollutants related to the receiving waters with 303(d)-listed impairments," including "dissolved oxygen, phosphorus, nitrogen, sulfates, selenium, total dissolved solids, high pH, turbidity, and fecal coliform." 2015 SWPPP § 4.8.

266.   Plaintiffs are informed, believe, and thereon allege that numerous pollutants are present in the Facility's storm water discharges in addition to TSS and O&G, and that as such the Facility SWPPP fails to account for numerous pollutants present at the Facility in violation of the General Industrial Permit.

267.   Storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1, evidences high concentrations of aluminum, copper, iron, lead, zinc, N+N, phosphorus, total coliform, fecal coliform, and enterococcus, which exceeded various Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations as discussed *supra*.

268.   Plaintiffs are informed, believe, and thereon allege pollutants commonly present in storm water discharged from facilities similar to the El Cajon Facility include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, N+N, total nitrogen, and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; and dissolved oxygen, among others. The 2015 SWPPP fails to assess, or even acknowledge, any of these pollutants in violation of the General Industrial Permit.

269.   For example, Facility inspection notes and photos from the County of San Diego show that the Facility handles significant quantities of MSW, green waste, e-waste, and other mixed recyclables, and that debris associated with these waste and recyclables streams is scattered about Facility.

270.   E-waste contains high levels of toxic materials such as lead, mercury, cadmium and arsenic, which can leach into the environment, and when mishandled, can lead to irreversible health effects, including cancers, miscarriages, neurological damage

and diminished IQs.

271.   The Facility SWPPP's own description of industrial activities and materials indicates the presence of additional pollutants beyond TSS, O&G, and pH. For example, the 2015 SWPPP acknowledges that "materials in the Transfer Building can migrate outside when the vehicles are loading or unloading because of wind or track-out and may be exposed to stormwater" (2015 SWPPP § 4.1.1); "the buy-back center is not under cover and is exposed to stormwater; therefore, paper, cardboard, aluminum, plastic, and glass debris may be exposed to stormwater" (*id.*); and "loading activities for household hazardous wastes and e-wastes are not conducted under cover and are potentially exposed to stormwater" (*id.* § 4.1.3).

272.   The 2015 SWPPP also identifies "organics" as one of the "most likely sources of stormwater pollutants" at the Facility. *Id.* § 4.2. The various waste and recycling streams identified in these processes typically involve pollutants such as pathogens and bacteria, nutrients, toxic metals, and other potentially toxic substances.

273.   Given the activities, operations, and materials present at this Facility, Plaintiffs are informed, believe, and thereon allege that the 2015 El Cajon Facility SWPPP fails to adequately and accurately assess the vast majority of the pollutants present at the Facility as a result of the Facility's industrial activities in violation of the Storm Water Permit's SWPPP requirements.

274.   Plaintiffs are informed, believe, and thereon allege that, due in part to the El Cajon Facility SWPPP's failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the Facility contains numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the General Industrial Permit.

275.   Plaintiffs are informed, believe, and thereon allege that, despite the significant concentrations of pollutants in the Facility's storm water discharges each and every year, the Facility's SWPPP has not been revised to include BMPs that adequately eliminate or reduce these pollutants, as required by the General Industrial Permit.

276.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility SWPPP fails to adequately assess the BMPs with respect to the Facility's potential pollutant sources.

277.   Defendant's own sampling data demonstrates the El Cajon Facility discharged storm water with concentrations of pollutants in exceedance of EPA Benchmarks values.

278.   Plaintiffs are informed, believe, and thereon allege, based on storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1, Plaintiff's experience with similarly situated facilities, the Facility's own SWPPP, inspections reports, and other evidence, that the El Cajon Facility has discharged and continues to discharge storm water with concentrations of pollutants in exceedance of CTR limits, and/or Basin Plan Objectives.

279.   Because the El Cajon Facility has discharged numerous pollutants in exceedance of Effluent Limitations and Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator has failed to develop and/or implement BMPs that:

    i.   adequately minimize the exposure of pollutants to storm water at the Facilities;

    ii.   adequately control and minimize polluted runoff from the Facilities;

    iii.   adequately treat and remove pollutants in storm water prior to the discharge;

    iv.   adequately prevent or control contaminated storm water from being discharged from the Facilities; and

    v.   adequately prevent or control contaminated NSWDs from being discharged from the Facilities.

280.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility SWPPP fails to adequately analyze the effectiveness of the Facility's existing BMPs.

281.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the

1  BMPs at the El Cajon Facility is in part a result of the Facility Owner and/or Operator's
2  failure to develop, implement, and revise adequate SWPPPs.

3      282.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility
4  Owner and/or Operator's failure to adequately revise the Facility's SWPPP, and thus
5  failure to improve the Facility's BMPs, despite the numerous and repeated exceedances
6  of Effluent Limitations, Receiving Water Limitations, and NALs identified in
7  Defendant's own monitoring data, ensures that these exceedances will continue in
8  violation of the General Industrial Permit.

9      283.   Every day the Facility Owner and/or Operator operates the Facility with an
10  inadequately developed and/or implemented SWPPP, and/or without properly revising
11  the SWPPP, is a separate and distinct violation of the General Industrial Permit, New
12  Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

13      284.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility
14  Owner and/or Operator has been in daily and continuous violation of the General
15  Industrial Permit SWPPP requirements since at September 20, 2014. These violations are
16  ongoing, and Plaintiffs will include additional violations when information becomes
17  available.

18      **E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate**
19          **Monitoring and Reporting Programs at the El Cajon Facility.**

20      285.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility
21  Owner and/or Operator has conducted and continues to conduct operations at the Facility
22  with an inadequately developed, implemented, and/or revised M&RP.

23      286.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility
24  Owner and/or Operator has failed and continues to fail to sample and analyze for all
25  parameters required by the Storm Water Permit. *See* 2015 Permit §§ XI.B.6.c, XI.B.6.e.
26  For example, despite the numerous types of wastes handled and processed by the Facility,
27  as described *supra*, Defendant analyzed its storm water samples only for the minimum
28  parameters of TSS, O&G, and pH until December 2, 2019. Moreover, even after

December 4, 2019, Defendant fails to sample for any bacteria, and fails to sample for any parameters aside from TSS, O&G, and pH at most Facility discharge points.

287.  Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit.

288.  The Facility Owner and/or Operator has failed to collect samples from each discharge point in violation of the General Industrial Permit. For example, the Facility SWPPP reports that the Facility has twelve industrial storm water discharge locations and one non-industrial discharge location. 2015 SWPPP § 8.1. However, on February 27, 2018, the Facility only collected samples from SW-2 through SW-9, and on November 29, 2018, the Facility only collected samples from SW-1 through SW-8, without providing explanation for why samples were not collected from each discharge point.

289.  Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator failed to collect samples for the requisite number of QSEs. For example, while the Storm Water Permit requires Permittees to collect four samples each reporting period, the Facility only collected three samples during the 2018–2019 reporting period, despite the occurrence of numerous QSEs during that reporting period. *See* Ex. 1.

290.  Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has failed to consistently and/or adequately conduct visual discharge observations and monitoring of BMPs as required by the Permit's M&RP requirements.

291.  Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility M&RP has failed and/or continues to fail to ensure BMPs have been adequately developed and/or implemented, or revised if necessary. *See* 1997 Permit, §§ B.2.a–b; 2015 Permit §§ X.I, XI.

292.  Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility

M&RP has failed and/or continues to fail to ensure storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the General Industrial Permit. *See* 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

293.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has failed to revise each M&RP as necessary to ensure compliance with the General Industrial Permit. *See* 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

294.   Because the El Cajon Facility Owner and/or Operator has failed to revise the Facility M&RP as required by the General Industrial Permit, the M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. *See* 1997 Permit § B.4.c; 2015 Permit § X.B.1.

295.   Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

296.   Plaintiffs are informed, believe, and thereon allege that every day the El Cajon Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP, is a separate and distinct violation of the General Industrial Permit and the Clean Water Act.

297.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has been in daily and continuous violation of the General Industrial Permit M&RP requirements since at least September 20, 2014.

298.   Plaintiffs are informed, believe, and thereon allege that these violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since September 20, 2014.

**F.     Defendant Has Failed to Comply with the General Industrial Permit's Reporting Requirements.**

299.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the General Industrial Permit reporting requirements.

300.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that accurately state number of discharge points at the Facility. For example, the Annual Reports for the reporting periods of 2015−16, 2016−17, 2017−18, and 2018−19 state that there are only nine discharge points at the Facility. However, the 2015 SWPPP and site map indicate there are thirteen total discharge points.

301.   Plaintiffs are informed, believe, and thereon allege the El Cajon Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that accurately state which pollutants are present at the Facility. For example, the 2015−16, 2016−17, 2017−18, and 2018−19 Annual Reports indicate that low dissolved oxygen, phosphorus, nitrogen, manganese, selenium, total dissolved solids, high pH, enterococcus, and fecal coliform are not present at the Facility. However, storm water monitoring data for samples collected from the Facility on May 16, 2019, at or near SW-1 indicates that phosphorus, nitrogen, enterococcus, and fecal coliform were found in high concentrations in the Facility's storm water.

302.   In each Annual Report since the filing of the 2013−14 Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance.

303.   Plaintiffs are informed, believe, and thereon allege the Facility has failed and continues to fail to update the SWPPP's BMPs to address existing potential pollutant sources. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks, thus demonstrating that the Facility

BMPs do not adequately address existing potential pollutant sources.

304.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to certify that the SWPPPs comply with the General Industrial Permit.

305.   Facility operators must report any noncompliance with the General Industrial Permit at the time that the Annual Report is submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

306.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility Owner and/or Operator has failed to report numerous instances of non-compliance as required by the General Industrial Permit.

307.   Plaintiffs are informed, believe, and thereon allege that every day Defendant conducts operations at the Facility without reporting as required by the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

308.   Plaintiffs are informed, believe, and thereon allege that the El Cajon Facility has been in daily and continuous violation of the General Industrial Permit reporting requirements since at least September 20, 2014.

309.   Plaintiffs are informed, believe, and thereon allege that these violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since September 20, 2014.

/././

/././

/././

/././

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

310.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

311.    Plaintiffs are informed and believe, and thereon allege that prohibited non-storm water discharges have discharged and continue to discharge from the Facility.

312.    The Facility Owner and/or Operator's failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

313.    Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator violated and will continue to violate this General Industrial Permit Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

314.    Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit.

315.    Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit.

316.    Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Discharge Prohibition at the Facility every day from September 20, 2014 to the present.

317. Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's violations of the General Industrial Permit Discharge Prohibitions are ongoing and continuous.

318. Each and every violation of the General Industrial Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

319. By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

320. An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

321. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

322. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

323. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

324. Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

325.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

326.    The Facility Owner and/or Operator's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; *see also* 33 U.S.C. § 1311(b).

327.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator violated and continues to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

328.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Effluent Limitation at the Facility every day from September 20, 2014, to the present.

329.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous.

330.    The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

331.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

332.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

333.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

334.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

335.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

### THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

336.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

337.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

338.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

339.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

340.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

341.   The Facility Owner and/or Operator's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ C.1−2; 2015 Permit §§ VI.A−B; *see also* 33 U.S.C. § 1311(b).

342.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the Facility.

343.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Receiving Water Limitations every day from September 20, 2014, to the present.

344.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit Receiving Water Limitations and the CWA are ongoing and continuous.

345.   The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the Facility.

346.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

347.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

348.   An action for injunctive relief under the Clean Water Act is authorized by

1  Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

2  alleged above would irreparably harm Plaintiffs and the citizens of the State of

3  California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

4       349.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

5  an actual controversy exists as to the rights and other legal relations of the Parties.

6  <u>**FOURTH CAUSE OF ACTION**</u>

7  **Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm**
**Water Pollution Prevention Plans in Violation of the General Industrial Permit and**
8  **the Clean Water Act.**

9  **33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

10       350.   Plaintiffs incorporate the allegations contained in the above paragraphs as

11  though fully set forth herein.

12       351.   Plaintiffs are informed and believe, and thereon allege, that the Facility

13  Owner and/or Operator has failed and continues to fail to develop and/or implement

14  adequate SWPPPs for the Facility.

15       352.   Plaintiffs are informed and believe, and thereon allege, that the Facility

16  Owner and/or Operator has failed and continues to fail to adequately revise the SWPPPs

17  for the Facility.

18       353.   Plaintiffs are informed and believe, and thereon allege, that the Facility

19  Owner and/or Operator conducts operations at the Facility each day without an

20  adequately developed, implemented, and/or revised SWPPP.

21       354.   The Facility Owner and/or Operator's failure to adequately develop,

22  implement, and/or revise SWPPPs for the Facility is a violation of the General Industrial

23  Permit and the Clean Water Act. *See* 1997 Permit § A; 2015 Permit § X; *see also*

24  33 U.S.C. § 1311(b).

25       355.   Plaintiffs are informed and believe, and thereon allege, that the Facility

26  Owner and/or Operator has been in violation of the General Industrial Permit SWPPP

27  requirements at the Facility every day from September 20, 2014, to the present.

28       356.   Plaintiffs are informed and believe, and thereon allege, that the Facility

Owner and/or Operator's violations of the General Industrial Permit SWPPP requirements and the CWA at the Facility are ongoing and continuous.

357.  The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the SWPPPs for the Facility.

358.  Each day that Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

359.  By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

360.  An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

361.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FIFTH CAUSE OF ACTION**

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring and Reporting Plans in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

362.  Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

363.  Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement an adequate M&RP for the Facility.

364.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to adequately revise the M&RP for the Facility.

365.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator conducts operations at the Facility each day without an adequately developed, implemented, and/or revised M&RP.

366.   The Defendant's failure to adequately develop, implement, and/or revise the M&RP for the Facility is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit § B; 2015 Permit § XI; *see also* 33 U.S.C. § 1311(b).

367.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit M&RP requirements every day from September 20, 2014, to the present.

368.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit M&RP requirements and the CWA at the Facility are ongoing and continuous.

369.   The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the M&RP for the Facility.

370.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate M&RP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

371.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

372.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs

1 have no plain, speedy, or adequate remedy at law.

2     373.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3 an actual controversy exists as to the rights and other legal relations of the Parties.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

8     374.   Plaintiffs incorporate the allegations contained in the above paragraphs as

9 though fully set forth herein.

10     375.   Plaintiffs are informed and believe, and thereon allege, that Defendant has

11 failed and continues to fail to submit accurate and/or complete Annual Reports for the

12 Facility.

13     376.   The Defendant's failure to submit complete and accurate Annual Reports is

14 a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit

15 §§ B.14, C.9–10; 2015 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

16     377.   Plaintiffs are informed and believe, and thereon allege, that the Facility

17 Owner and/or Operator conducts operations at the Facility each day without reporting as

18 required by the General Industrial Permit.

19     378.   Plaintiffs are informed and believe, and thereon allege, that Defendant has

20 been in violation of the General Industrial Permit's reporting requirements every day

21 since at least September 20, 2014.

22     379.   Plaintiffs are informed and believe, and thereon allege, that Defendant's

23 violations of the reporting requirements of the General Industrial Permit and the CWA

24 are ongoing and continuous.

25     380.   Defendant will continue to be in violation of the General Industrial Permit

26 and the CWA each and every day they fail to comply with the General Industrial Permit

27 reporting requirements at the Facility.

28     381.   Each and every violation of the General Industrial Permit reporting

requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

382.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

383.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

384.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the General Industrial Permit.
33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

385.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

386.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility.

387.   The Facility Owner and/or Operator's failure to conduct the requisite visual observations at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.3–4; 2015 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

388.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed to collect and analyze the required number of storm water samples the Facility.

389.   The Facility Owner and/or Operator's failure to collect and analyze the required number of storm water samples at the Facility is a violation of the General

Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.a–b, 2015 Permit §§ XI.B.1–3; *see also* 33 U.S.C. § 1311(b).

390.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to analyze all collected samples for all required parameters.

391.   The Facility Owner and/or Operator's failure to analyze all collected samples for all required parameters is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 Permit §§ XI.B.6, XI.D; *see also* 33 U.S.C. § 1311(b).

392.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to comply with the General Industrial Permit's monitoring requirements at the Facility since September 20, 2014.

393.   Plaintiffs are informed and believe, and thereon allege, that the several of the Facility Owner and/or Operator's violations of the General Industrial Permit monitoring requirements and the Clean Water Act are ongoing and continuous.

394.   The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit's monitoring requirements.

395.   Each and every violation of the General Industrial Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

396.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 20, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

397.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs

1   have no plain, speedy, or adequate remedy at law.

2        398.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3   an actual controversy exists as to the rights and other legal relations of the Parties.

4        WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

5   **VII.   RELIEF REQUESTED**

6        399.   Plaintiffs respectfully request that this Court grant the following relief:

7        a.     A court order declaring the Defendant to have violated and to be in violation

8   of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for

9   discharging pollutants from the Facility in violation of a permit issued pursuant to

10  Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations

11  which include BAT/BCT requirements, for failing to meet receiving water limitations,

12  and for failing to comply with the substantive and procedural requirements of the General

13  Industrial Permit;

14       b.     A court order enjoining Defendant from discharging pollutants without a

15  NPDES permit;

16       c.     A court order requiring Defendant to implement affirmative injunctive

17  measures designed to eliminate Defendant's violations of the substantive and procedural

18  requirements of the General Industrial Permit and the Clean Water Act;

19       d.     A court order assessing civil monetary penalties for each violation of the

20  CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009,

21  and $54,833.00 per day per violation for violations that occurred after November 2, 2015,

22  as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil

23  Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

24       e.     A court order awarding Plaintiffs their reasonable costs of suit, including

25  attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

26  Water Act, 33 U.S.C. § 1365(d); and

27  /./.

28  /./.

f.      Any other relief as this Court may deem appropriate.

Dated: February 6, 2020

Respectfully submitted,

COAST LAW GROUP LLP


By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com


SAN DIEGO COASTKEEPER


By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org