UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a California non-profit corporation; and COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a California non-profit corporation,<br><br>                                         Plaintiffs,<br><br>v.<br><br>USA WASTE OF CALIFORNIA, INC., a Delaware corporation,<br><br>                                         Defendant. | Case No.:  20-CV-233 JLS (WVG)<br><br>**CONSENT DECREE**<br><br>(ECF No. 14) |

The following Consent Decree (or "Agreement") is entered into by and between San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") (collectively, "Plaintiffs") and USA Waste of California, Inc. ("Defendant"). The entities entering into this Consent Decree are each an individual "Party" and collectively the "Parties."

**WHEREAS**, Coastkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in San Diego, California;

/ / /

**WHEREAS**, Coastkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of San Diego County from all sources of pollution and degradation;

**WHEREAS**, CERF is a non-profit organization founded by surfers in North San Diego County and active throughout California's coastal communities;

**WHEREAS**, CERF contends it was established aggressively to advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents and that one of CERF's primary areas of advocacy is water quality protection and enhancement;

**WHEREAS**, USA Waste of California, Inc. leases the facility located at 1001 West Bradley Avenue, El Cajon, California  92020, hereinafter referred to by the Parties as the "El Cajon Facility" or the "Facility;"

**WHEREAS**, USA Waste of California, Inc. operates a waste and recyclables transfer station, recyclables buyback, and household hazardous waste center and equipment maintenance and storage area at the El Cajon Facility;

**WHEREAS**, Plaintiffs contend that their members live and/or recreate in and around waters that Plaintiffs' members allege receive discharges from the El Cajon Facility, including specifically Forester Creek, the San Diego River, and eventually the Pacific Ocean;

**WHEREAS**, the discharges from the El Cajon Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Storm Water Permit") and as amended by Order No. 2014-0057-DWQ ("2014 Storm Water Permit"), and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA");

**WHEREAS**, on September 20, 2019, Plaintiffs sent Defendant, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the San Diego Regional Water Quality Control Board

("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the 1997 and 2014 Storm Water Permits at the Facility;

**WHEREAS**, on February 7, 2020, Plaintiffs filed a complaint against Defendant in the United States District Court, Southern District of California (Case No. 3:20-CV-233 JLS (WVG)), alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the 1997 and 2014 Storm Water Permits at the El Cajon Facility (the "Complaint");

**WHEREAS**, Plaintiffs allege Defendant to be in violation of the substantive and procedural requirements of the 1997 Storm Water Permit, the 2014 Storm Water Permit, and the Clean Water Act with respect to the El Cajon Facility;

**WHEREAS**, Defendant denies all allegations in the Notice Letter and Complaint relating to the El Cajon Facility;

**WHEREAS**, Plaintiffs and Defendant have agreed that it is in the Parties' mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings;

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.     The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a);

2.     Venue is appropriate in the Southern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the El Cajon Facility is located within this District;

/ / /

3.     The Complaint states claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1);

4.     Plaintiffs have standing to bring this action;

5.     The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

## I.     OBJECTIVES

6.     It is the express purpose of the Parties entering into this Consent Decree to further the objectives set forth in the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*., and to resolve those issues alleged by Plaintiffs in their Complaint.  In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree and to comply with the requirements of the 2014 Storm Water Permit and all applicable provisions of the Clean Water Act.  Specifically, Defendant agrees to comply with Receiving Water Limitation VI.A. in the 2014 Storm Water Permit, which requires that Defendant "shall ensure that industrial storm water discharges and authorized Non-Storm Water Discharges ("NSWDs") do not cause or contribute to the exceedance of any applicable water quality standards in any affected receiving water," and Effluent Limitation V.A. of the 2014 Storm Water Permit, which requires that Defendant "shall implement Best Management Practices ("BMPs") that comply with the [Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT")] requirements of the [2014 Storm Water Permit] to reduce or prevent discharges of pollutants in [Defendant's] storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability."

## II.    AGENCY REVIEW AND TERM OF CONSENT DECREE

7.     Plaintiffs shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively, the "Federal Agencies") within three (3) days of the final signature of the Parties for agency review consistent with 40 C.F.R. § 135.5.  The

4

agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the Federal Agencies or the certified return receipts, copies of which shall be provided to Defendant if requested.  In the event that the Federal Agencies object to entry of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time.  If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

8.    The term "Effective Date" as used in this Consent Decree shall mean the day the Court enters this Consent Decree.

9.    This Consent Decree shall terminate three (3) years after the Effective Date, unless Early Termination is triggered pursuant to paragraph 10 of this Agreement (the earlier of which shall be the "Termination Date" as used in this Consent Decree).

10.    This Consent Decree will terminate early ("Early Termination") in the following circumstances:

10.1    If Defendant ceases its operations at the El Cajon Facility, transfers its operations at the El Cajon Facility to another entity, is no longer subject to the 2014 Storm Water Permit, or files a Notice of Termination via the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") pursuant to the 2014 Storm Water Permit section II.C.1, and the Notice of Termination is accepted by the State or Regional Board; or

10.2    Otherwise by mutual agreement of the Parties after notice to the Department of Justice.

10.3    If, once the adopted 2018 Storm Water Permit Amendments become effective (currently scheduled for July 1, 2020), Defendant implements and is in compliance at the El Cajon Facility with either the "On-Site Compliance Option" or

"Off-Site Compliance Option," as defined and detailed in Attachment I of the 2018 Storm Water Permit Amendments, Defendant will no longer have to meet the requirements of Section III of this Consent Decree so long as Defendant maintains compliance with either of those options at the El Cajon Facility.

11.     Plaintiffs may conduct an inspection of the El Cajon Facility up to forty-five (45) days prior to the Termination Date. The inspection shall be conducted according to the rules applicable to Annual Site Inspections described in paragraphs 27 and 28 below.

## III.    COMMITMENTS OF THE PARTIES

### A.     Storm Water Pollution Control Best Management Practices.

12.     Defendant shall maintain and/or develop and implement appropriate Best Management Practices ("BMPs") necessary to comply with the Storm Water Permit.

13.     The BMPs that Defendant plans to maintain and/or develop and implement for the El Cajon Facility as part of this Agreement are described in Exhibit A.

### B.     Discharge Locations and Storm Water Sampling.

14.     Discharge Locations. The current storm water sample locations ("Discharge Locations") for the El Cajon Facility are identified in Exhibit B.  Should the Discharge Locations change from what is presently depicted on Exhibit B, Defendant will provide Plaintiffs with an updated exhibit.

15.     Sampling. The following storm water monitoring procedures shall be implemented at the El Cajon Facility:

15.1   Frequency. During the term of this Agreement, Defendant shall collect samples from all Discharge Locations with flow at the El Cajon Facility from a minimum of four (4) "qualified storm events" ("QSEs"), as defined by the 2014 Storm Water Permit, that occur in a "Reporting Year," as defined by the 2014 Storm Water Permit, such that Defendant collects two (2) samples during the first half of the Reporting Year and two (2) samples during the second half of the Reporting Year.  If, prior to March 1, Defendant has collected samples from two (2) or fewer QSEs during that Reporting Year, Defendant shall collect samples during as many

QSEs as necessary until a minimum of 4 storm events have been sampled for the Reporting Year, if feasible. No two (2) samples may be from the same QSE.

15.2   <u>Contained or Stored Storm Water</u>. Defendant shall sample stored or contained storm water discharges from Discharge Locations at the El Cajon Facility, if any, pursuant to Section XI.B.4 of the 2014 Storm Water Permit.

15.3   <u>Parameters</u>. Defendant shall analyze each storm water sample collected from a Discharge Location, pursuant to paragraph 16.1 or 16.2, for the parameters set forth in the below Table 1 Numeric Levels.

15.4   <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Agreement.

15.5   <u>Detection Levels</u>. Defendant shall request that the laboratory use analytical methods adequate to detect the individual contaminants at or below Table 1 Numeric Levels.

15.6   <u>Hold Time</u>. All samples collected from the El Cajon Facility shall be delivered to the laboratory as necessary, using reasonable best efforts, to ensure that sample "hold time" is not exceeded for each contaminant sampled.

15.7   <u>Results</u>. Defendant shall request that sample analysis results be reported to them as soon as possible without incurring "rush" charges.

15.8   <u>Reporting</u>. Defendant shall provide Plaintiffs with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report for all samples described and taken in accordance with the samples identified in paragraphs 15.1 and 15.2 collected at the El Cajon Facility, within ten (10) business days of receiving the results.

**C.**   **<u>Reduction of Pollutants in Discharges.</u>**

16.   <u>Contaminant Reduction</u>. Unless otherwise provided by this Agreement, Defendant shall develop and implement BMPs to reduce pollutants in storm water

/ / /

/ / /

discharges from the El Cajon Facility to levels at or below those in Table 1 ("Numeric Levels").[1]

**Table 1** [2]

| Pollutant | Numeric Level[3] |
|-----------|------------------|
| Total Recoverable Zinc* | 0.26 mg/L* |
| Total Recoverable Copper* | 0.0332 mg/L* |
| Total Recoverable Aluminum | 0.750 mg/L |
| Total Recoverable Iron | 0.3 mg/L |
| Nitrate + Nitrite Nitrogen | 0.68 mg/L |
| Total Recoverable Lead* | 0.262 mg/L* |
| Enterococcus | 61 MPN/100 mL |
| Fecal Coliform | 400 MPN/100 mL |
| Chemical Oxygen Demand | 120 mg/L |
| Total Phosphorous | 0.1 mg/L |
| pH | 6.5-8.5    s.u. |

*In the case of copper, lead, and zinc, the values listed are the more conservative of the NALs and the hardness-adjusted California Toxics Rule values.

17.   <u>Action Plan for Table 1 Exceedances</u>. If Defendant's monitoring reveals  two exceedances of a pollutant's Numeric Level at any Discharge Location, and there is not

---

[1]The Numeric Levels for metals marked with an asterisk are hardness dependent.  Metal constituents will be removed from Table 1 for a Discharge Location if the El Cajon Facility's storm water sampling under this Consent Decree results in non-detect levels for the metal constituent at that Discharge Location for two (2) consecutive sampled discharges from QSEs.

[2] Unless Defendant's pollutant source assessment states there is the likely presence of additional Pollutants at Discharge Location SW6, Defendant shall be required to meet only the pH and Iron Numeric Limits of Table 1 at SW6.

[3] Plaintiffs agree if any Pollutant is not detected in two consecutive samples taken during a QSE at a Discharge Location, then that Pollutant will be removed from Table 1 in this Consent Decree for that Discharge Location.

already an Action Plan[4] currently being prepared or in the process of being implemented by Defendant to address or that will address that pollutant ("Action Plan Triggering Event"), Defendant shall prepare an Action Plan for the El Cajon Facility for reducing the Numeric Level of that pollutant.[5] When required, a proposed Action Plan must be submitted to Plaintiffs within forty-five (45) days after Defendant receives the laboratory results reflecting an Action Plan Triggering Event, unless Defendant requests and Plaintiffs agree to an extension, which agreement shall not be unreasonably withheld.

17.1    Action Plan Requirements. The Action Plan shall include at a minimum: (1) the identification of the pollutant(s) causing the Action Plan Triggering Event; (2) an assessment of the potential source of each pollutant discharged that caused the Action Plan Triggering Event; (3) the identification of additional BMPs, if any, that will be designed and implemented for the location(s) of the exceedance discharge in an effort to prevent future exceedances of parameters that triggered the Action Plan (including the possibility of a treatment control BMP, which would be designed to meet the 2014 Storm Water Permit's Design Storm Standard pursuant to Section X.h.6); and (4) time schedules for implementation of proposed BMPs (if any).  Submitting an Action Plan that does not address all of the requirements in this paragraph will be considered a missed deadline after dispute resolution, if any.

17.2    Action Plan Review. Plaintiffs shall have thirty (30) days upon receipt of Defendant's proposed Action Plan to approve or provide comments to Defendant on the proposed Action Plan.  If Plaintiffs provide Defendant comments on the

---

[4] The Action Plan discussed in this Consent Decree is separate and distinct from any "Action Plan" discussed in the Storm Water Permit.

[5] To the extent there is a dispute between the Parties regarding whether another Action Plan is required for an exceedance of a pollutant when there is already an Action Plan being prepared or in the process of being implemented by Defendant, that dispute shall be resolved pursuant to the Dispute Resolution Procedures under Section VI of this Agreement.

proposed Action Plan, Defendant shall have thirty (30) days from receipt of Plaintiffs' comments, unless Defendant requests and Plaintiffs agree to an extension, which agreement shall not be unreasonably withheld, to either incorporate Plaintiffs' material comments into the Action Plan and seek Plaintiffs' approval of the modified Action Plan or another round of comments if mutually agreed, or, if Defendant declines to accept one or more of Plaintiffs' material comments, provide Plaintiffs with a written explanation of the grounds for such rejection.  Any disputes over the Action Plan, including any requested extensions, shall be resolved pursuant to the Dispute Resolution Procedures of this Agreement, set out in Section VI below. Defendant shall not be required to begin implementation of any Action Plan until Plaintiffs have approved the Action Plan, until the dispute over the Action Plan has been resolved through the Dispute Resolution Procedures, or until mutual agreement of the Parties, whichever is later ("Implementation Triggering Event").

17.3    <u>Action Plan Implementation Timeline</u>.  The time schedule(s) for implementation of BMPs pursuant to any Action Plan shall ensure that all BMPs are implemented as soon as possible.  Unless the Parties agree during the Action Plan Review process to a longer time period based on the time needed to design, permit, procure, and/or install the necessary equipment, Defendant will implement new BMPs in an Action Plan within three (3) months of the Implementation Triggering Event for BMPs not requiring permitting or approval from agencies or other necessary parties (including, but not limited to, City of El Cajon and the County of San Diego), and within six (6) months of the Implementation Triggering Event for BMPs requiring permitting or approval ("Presumptive Implementation Deadlines"). If Defendant's Action Plan includes BMPs which require QSE sampling for calibration pursuant to paragraph 17.3.1, the Action Plan implementation timeline shall indicate that discharge monitoring is necessary and will take place when the first QSE following completion of the BMP occurs. To the extent Defendant believes it needs additional time beyond the Presumptive Implementation Deadlines to

complete the implementation of new BMPs pursuant to an Action Plan, or to the extent that, pursuant to paragraph 40, Defendant's performance within the Presumptive Implementation Deadlines is impossible, illegal, or otherwise prevented by circumstances beyond the Defendant's control, including due to Force Majeure, Defendant will request in writing an extension from Plaintiffs. Plaintiffs agree that they will not unreasonably withhold agreement to extend any implementation deadlines.  Any disputes over the Action Plan implementation timeline, including any requested extensions, shall be resolved pursuant to the Dispute Resolution provisions of this Agreement, set out below in Section VI of this Agreement.

 17.3.1.  <u>Action Plan QA/QC</u>. If necessary, any BMP quality assurance and quality control ("QA/QC"), including QSE sampling required to calibrate advanced treatment BMPs, shall occur before the Presumptive Implementation Deadline, if feasible.  In the event a QSE does not occur after the Action Plan BMPs are fully operational and before expiration of the Presumptive Implementation Deadline (or any mutually agreed upon extension thereto), Defendant's Presumptive Implementation Deadline shall be automatically extended until the earlier of: (1) 30 days after the next QSE after the Presumptive Implementation Deadline, or (2) the date of receipt of laboratory results from samples taken during the next QSE after the Presumptive Implementation Deadline.  Any Table 1 exceedances occurring prior to the Presumptive Implementation Deadline, prior to any automatic extensions under this paragraph or prior to any mutually agreed upon extension, shall not constitute an Action Plan Triggering Event.

17.4  Disputes regarding the adequacy of a particular aspect of the Action Plan shall not impact the schedule for implementing any other unrelated aspect of the Action Plan.  Any disputes as to the adequacy of the Action Plan shall be resolved

/ / /

pursuant to the Dispute Resolution provisions of this Agreement, set out in Section VI below, which shall not be subject to stipulated penalties.

18.     Defendant shall contact Plaintiffs to request an extension of any deadline set forth in this Agreement, if necessary, prior to the deadline at issue.  Failure to request an extension, if necessary, in this timeframe will be considered a missed deadline.  Plaintiffs' consent to Defendant's requested extension shall not be unreasonably withheld.

19.     Defendant shall revise its Storm Water Pollution Prevention Plans ("SWPPPs") and/or Monitoring & Reporting Plans ("M&RP"), if applicable, within forty-five (45) days of completion and implementation of additional BMPs set forth in the Action Plan.  Defendant shall notify Plaintiffs via email when the Action Plan has been completely implemented, and the SWPPP and/or M&RP have been revised, if such revisions are necessary.

**D.     Visual Observations.**

20.     Until the Termination Date of the Agreement, Defendant shall conduct and document visual observations required by the Storm Water Permit and as more fully described in the El Cajon Facility SWPPP.

**E.     Employee Training.**

21.     Within sixty (60) days of the Effective Date, Defendant shall conduct employee training in order to familiarize employees at the El Cajon Facility with the requirements of the Storm Water Permit and this Agreement.  The training program shall include, in particular, the requirements that are contained in this Agreement.

**F.     Storm Water Pollution Prevention Plan and Monitoring and Reporting Plan.**

22.     Within ninety (90) days of the Effective Date of this Agreement, Defendant shall revise the El Cajon Facility's SWPPP and/or M&RP as applicable to include:

22.1   BMPs that are currently utilized at the El Cajon Facility;

22.2   BMPs identified, developed, and implemented pursuant to this Agreement and/or the Storm Water Permit;

22.3  The specific individual(s) or position(s) responsible for compliance with the Storm Water Permit;

22.4   A detailed site map that includes at a minimum all information required by the Storm Water Permit; and

22.5   A description of each industrial activity, potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source.

23.   Plaintiffs shall provide reasonable and material comments, if any, to Defendant within thirty (30) days of receipt of any revised SWPPP and M&RP. Within forty-five (45) days of receiving comments from Plaintiffs, Defendant shall incorporate Plaintiffs' reasonable and material comments into any revised SWPPP and/or M&RP or shall justify in writing to Plaintiffs why any comment is not incorporated.  Any disputes as to the adequacy of the SWPPP and/or M&RP shall be resolved pursuant to the Dispute Resolution Procedures of this Agreement set forth in Section VI below.

24.   Additional and Ongoing Revisions to SWPPP and/or M&RP. Defendant shall revise its SWPPPs and/or M&RPs if there are any material changes in the El Cajon Facility's operations that may possibly affect the quality of storm water discharges at the El Cajon Facility, including but not limited to changes to storm water Discharge Location(s) or changes or additions to the BMPs at the El Cajon Facility resulting from an Action Plan.  Plaintiffs may review and comment on the revised SWPPP and/or M&RP if a significant revision has been made, e.g., change or reduction of Discharge Locations, implementation of advanced BMPs, removal of a constituent to be sampled, etc.  Defendant will incorporate Plaintiffs' reasonable and material comments concerning material and significant revisions into any revised SWPPP and/or M&RP or shall justify in writing why any comment is not incorporated.

25.   Future Pollutant Source Assessments.  Defendant may remove a constituent from their El Cajon Facility's SWPPP and M&RP and from Table 1 in this Agreement if new information becomes available supporting an amended SWPPP pollutant source

assessment relating to the constituent, including—consistent with Sections XII.D.2.b and c of the 2014 Storm Water Permit—a demonstration that (a) a Numeric Level exceedance(s) is attributable solely to the presence of non-industrial pollutant sources or to the presence of the pollutant in the natural background that has not been disturbed by industrial activities; or (b) where the pollutant is also present due to industrial activities, the pollutant contribution from the industrial activities by itself does not result in a Numeric Level exceedance(s), and the following is satisfied: (i) Defendant submit a written evaluation in support of the amended SWPPP pollutant source assessment determination to a mutually agreed upon third-party consultant for review, and (ii) the third party consultant subsequently concurs with Defendant's evaluation. Defendant shall be responsible for all expenses related to the assessment review and determination. If Plaintiffs have conducted their Annual Site Inspection (per paragraph 27 below) prior to submission of the written evaluation, Plaintiffs shall be provided an opportunity to conduct an additional site inspection to support their written response prior to submission of the issue to the third-party consultant.

## IV.   COMPLIANCE MONITORING AND REPORTING

26.   <u>Annual Site Inspections</u>. Each Reporting Year until the Termination Date of this Agreement, Plaintiffs and their representatives may conduct up to one (1) noticed site inspection per Reporting Year ("Annual Site Inspection").  The Annual Site Inspection shall be limited to (1) an inspection of the storm water pollution prevention systems, including BMPs, improvements, and industrial operations that come into contact with storm water; and (2) collection of storm water samples from QSEs that result in a discharge at a Discharge Location.  The Annual Site Inspection shall occur during normal business hours, and Plaintiffs shall provide Defendant with three (3) business days' notice of an intended inspection. Plaintiffs will confirm with Defendant at least twenty-four (24) hours prior to the start of an Annual Site Inspection that there is sufficient rainfall such that Plaintiffs intend to conduct their Annual Site Inspection during a QSE.  Plaintiffs will make efforts to conduct their Annual Site Inspection during a QSE, but a lack of a QSE will not

prevent Plaintiffs from conducting an Annual Site Inspection. During all Annual Site Inspections, Plaintiffs' representatives shall wear safety goggles, hard hats, vests, steel-toed boots, and any other appropriate personal protective equipment and remain in the presence of Defendant's representatives at all times, and Plaintiffs shall sign a standard Release and Waiver Agreement with Defendant including, but not limited to, covering any personal injury or damage that Plaintiffs, their representatives, or assigns could incur during or as a result of an Annual Site Inspection and limiting use of videographic, photographic, or other recordings to the Dispute Resolution Process.  Plaintiffs' inspection team shall consist of no more than six (6) persons.  Notice of any inspection under this paragraph shall be provided by telephone and electronic mail to all of the following individuals for Defendant:

Catherine Riegle Finley, Esq.
Senior Legal Counsel
USA Waste of California, Inc.
(818) 252-3141
CRiegle@wm.com

Bill Bixler
Senior District Manager
USA Waste of California, Inc.
(619) 596-5183
BBixler@wm.com

27.     During the Annual Site Inspection, Plaintiffs and/or their representatives shall be allowed access to the El Cajon Facility's SWPPPs and M&RPs. In addition, during the Annual Site Inspection, Plaintiffs and/or their representatives may collect split samples of discharges from QSEs at the El Cajon Facility, consistent with the sampling requirements

of the Storm Water Permit. Plaintiffs shall provide Defendant with properly preserved split samples. Plaintiffs shall submit any samples collected by them or their representatives to a certified California laboratory for analysis. Any onsite measurements by Plaintiffs such as pH shall be taken by a properly trained operator with properly calibrated instruments. Defendant shall have an opportunity to take concurrent measurements using their own equipment. Copies of the complete laboratory reports shall be provided to Defendant within ten (10) business days of receipt. Plaintiffs shall bear all costs of inspection, sampling, and analysis.

28. <u>Reporting and Documents</u>. Until the Termination Date of this Agreement, Defendant shall copy Plaintiffs on all final documents related to storm water discharges at the El Cajon Facility that are required to be submitted by the Storm Water Permit and are submitted to the Regional Board and/or State Board and/or any State or local agency or municipality. Such reports and documents shall be provided to Plaintiffs concurrently as they are sent to the agencies and/or municipalities. Until the Termination Date of the Agreement, any material correspondence related to Defendant's compliance with the Storm Water Permit or storm water discharges received by Defendant from any regulatory agency, State or local agency, county, or municipality shall be provided to Plaintiffs within ten (10) business days of receipt by Defendant.

29. <u>Compliance Monitoring and Oversight</u>. Defendant shall pay a combined total of Ten Thousand dollars ($10,000.00) to compensate Plaintiffs for costs and fees to be incurred for monitoring the El Cajon Facility's compliance with this Agreement, including, but not limited to, anticipated costs and fees related to Annual Site Inspections. Payment shall be made within thirty (30) days of the Effective Date payable to Coastal Environmental Rights Foundation via certified U.S. Mail or commonly accepted carrier to 1140 South Coast Highway 101 Encinitas, California 92024.

30. <u>Action Plan Payment</u>. Defendant shall pay a combined total of seven thousand five hundred dollars ($7,500.00) per Action Plan, deemed to be full payment for all of Plaintiffs' costs to review and comment on any Action Plan submitted. Payment shall be

made within thirty (30) days of the submittal of an Action Plan and payable to Coastal Environmental Rights Foundation via certified U.S. Mail or commonly accepted carrier to 1140 South Coast Highway 101 Encinitas, California  92024.

## V.   Environmental Project, Reimbursement of Fees and Costs, and Stipulated Payments

31.   <u>Environmental Project</u>. To remediate the alleged environmental harms resulting from non-compliance with the Storm Water Permit alleged in the Complaint, Defendant agrees to make a combined total payment of Seventeen Thousand Five Hundred dollars ($17,500.00) to San Diego Audubon to fund environmental project activities that will reduce or mitigate the impacts of storm water pollution from industrial activities on the Southern California Bight and its tributaries.  Payment shall be made payable to: San Diego Audubon, Attn: Chris Redfern, 4010 Morena Blvd, San Diego, California  92117 within thirty (30) days of the Effective Date of this Agreement.  Any Party may request an end-of-expenditure update from San Diego Audubon.

32.   <u>Reimbursement of Coast Law Group's Fees and Costs</u>. Defendant shall pay a combined total of sixty-four thousand dollars ($64,000.00) to Coast Law Group, LLP and San Diego Coastkeeper to reimburse investigation fees and costs, expert/consultant fees and costs, and reasonable attorneys' fees incurred as a result of investigating and preparing the lawsuit and negotiating this Agreement.  Payments shall be made within thirty (30) days of the Effective Date and payable to: Coast Law Group, LLP, Attn: Livia Borak Beaudin via certified U.S. Mail or commonly accepted carrier to 1140 South Coast Highway 101 Encinitas, California  92024.

33.   <u>Stipulated Payments</u>. Defendant shall make a combined remediation payment of one thousand five hundred dollars ($1,500.00) as the sole remedy for each missed deadline included in this Agreement, not excused by Force Majeure or agreement by Plaintiffs. Payments for a missed deadline shall be used to fund environmental project activities that will benefit the Southern California Bight and its tributaries.  Defendant shall have thirty (30) days from notification to cure any missed deadline (i.e., submit the

outstanding deliverable) or, in the alternative, invoke the Dispute Resolution Procedures set forth in Section VI below.  Unless Dispute Resolution Procedures have been invoked, Defendant agrees to make the stipulated payment within thirty (30) days of notification of a missed deadline to San Diego Audubon, Attn: Chris Redfern, 4010 Morena Blvd, San Diego, California  92117.  Defendant shall provide Plaintiffs with a copy of each such payment at the time it is made.

## VI.    DISPUTE RESOLUTION

34.    This Court shall retain jurisdiction over this matter until the Termination Date for the purposes of implementing and enforcing the terms and conditions of this Agreement and adjudicating all disputes among the Parties that may arise under the provisions of this Agreement.  The Court shall have the power to enforce this Agreement with all available legal and equitable remedies, including contempt.

35.    Meet and Confer. A Party to this Agreement shall invoke the dispute resolution procedures ("Dispute Resolution Procedures") of this Section by notifying all other Parties in writing of the matter(s) in dispute.  The Parties shall then meet and confer in good faith (either telephonically or in person) in an attempt to resolve the dispute informally over a period of ten (10) business days from the date of receipt of the notice. Parties may elect to extend this time in an effort to resolve the dispute without court intervention.

36.    Formal Dispute Resolution. If the Parties cannot resolve a dispute by the end of meet and confer informal negotiations, the Party initiating the Dispute Resolution Procedures may invoke formal dispute resolution ("Formal Dispute Resolution") by filing a motion before the United States District Court for the Southern District of California. The Parties agree to request an expedited hearing schedule on the motion if requested by any Party.  The Formal Dispute Resolution process described in this Section VI shall be the sole and exclusive remedy for judicially resolving and enforcing any and all disputes between the Parties regarding the subject matter of this Consent Decree.

/ / /

37.   <u>Burden of Proof</u>. The burden of proof for Formal Dispute Resolution shall be in accordance with applicable law.

37.1   In the event of any disagreement or dispute between Plaintiffs and Defendant over the necessity or appropriateness of implementing any particular BMP or set of BMPs, Defendant shall bear the burden of demonstrating that their BMPs, collectively, constitute BAT/BCT for the El Cajon Facility, or that they are in compliance with the terms of this Agreement.

38.   <u>Costs and Fees.</u> The Parties shall be entitled to seek fees and costs incurred in filing or opposing any motion made to the Court for the purpose of Formal Dispute Resolution in Section VI, according to the costs and fees provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions.

39.   <u>Force Majeure</u>. No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when performance becomes impossible, illegal, or is prevented by circumstances beyond the Party's control, including Force Majeure, which includes any act of god, war, fire, earthquake, windstorm, flood, or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or by any public authority or agency; inability to proceed due to pending litigation under the California Environmental Quality Act; action or non-action by, or inability to obtain the necessary authorizations, approvals, or permits from, any governmental agency; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available, though the cost of such material or equipment is not a factor in whether it is reasonably available; equipment damage that is beyond Defendant's control; and other unforeseeable circumstances beyond the control of the Parties and that the affected Party cannot avoid even by using its best efforts.  Impossibility and/or Force Majeure shall not include normal inclement weather.  Except in the case of any catastrophic event that precludes normal banking and funds transfers such as emergency closing of the Federal Reserve Banking system, financial inability to pay for

improvements will not be considered to be circumstances beyond Defendant's control. Any Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and which by exercise of due diligence has been unable to overcome the failure or performance.  Delay in compliance with a specific obligation under this Agreement due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Agreement.

39.1   If Defendant seeks to rely upon paragraph 39 to excuse or postpone performance, they shall notify Plaintiffs in writing as soon as possible, but in no event more than fifteen (15) business days of the date that Defendant learns of the event or circumstance that caused or would cause a violation of this Agreement (hereinafter referred to as the "Notice of Nonperformance").  Failure to send a Notice of Nonperformance shall not be a missed deadline.

39.2   Within thirty (30) days of sending the Notice of Nonperformance, Defendant shall send Plaintiffs a detailed description of the reason for the nonperformance and the specific obligations under the Agreement that are or have been affected by the Force Majeure. They shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by Defendant to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. Defendant shall adopt all reasonable measures to avoid and minimize such delays. Failure to send such description shall not be a missed deadline.

39.3   The Parties shall meet and confer in good faith concerning the non-performance and, where the Parties concur that Defendant's nonperformance is excused or postponed pursuant to paragraph 39, despite the timely good faith efforts of the Parties, new deadlines shall be established.

///

39.4   If the Parties disagree on a Notice of Nonperformance, or in the event that the Parties cannot timely agree on the terms of new performance deadlines or requirements or on an extension of time to informally resolve their disagreement, either Party shall have the right to invoke the Dispute Resolution Procedures.  If the disagreement cannot be resolved informally and Formal Dispute Resolution is invoked, Defendant shall bear the burden during Formal Dispute Resolution of proving that any delay in performance of any requirement of this Agreement was caused or will be caused by impossibility and/or Force Majeure and the extent of any delay attributable to such circumstances.

## VII.   MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

40.   Plaintiffs' Release. Upon the Effective Date of this Agreement, CERF and Coastkeeper, on their own behalf and on behalf of their current and former officers, directors, employees, and each of their successors and assigns; and their agents, attorneys, and other representatives, release all persons including, without limitation, Defendant (and each of its direct and indirect parent and subsidiary companies and affiliates; and its respective current and former officers, directors, members, employees, shareholders; and each of its predecessors, successors, and assigns; and each of its agents, attorneys, consultants, and other representatives) from and waive all claims alleged in this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed for matters related to Plaintiffs' Notice Letter and/or Complaint and/or the Formal Dispute Resolution Process in Section VI up to the Termination Date of this Agreement, except for fees and costs that may be awarded in connection with the Formal Dispute Resolution Process pursuant to paragraph 39.

41.   Defendant's Release. Upon the Effective Date of this Agreement, Defendant, on its own behalf and on behalf of its current and former officers, directors, employees, members and each of its successors and assigns, and their agents, attorneys, and other representatives, release Plaintiffs (and their current and former officers, directors, employees, members, direct and indirect parents, subsidiaries, and affiliates; and each of

their successors and assigns, and their agents, attorneys, and other representatives) from and waive all claims alleged in this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed for matters related to Plaintiffs' Notice Letter and/or Complaint and/or the Formal Dispute Resolution Process in Section VI up to the Termination Date of this Agreement, except for fees and costs that may be awarded in connection with the Formal Dispute Resolution Process pursuant to paragraph 39.

42.    Nothing in this Agreement limits or otherwise affects any Party's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the State Board, Regional Board, EPA, or any other administrative body on any other matter relating to Defendant's compliance with the Storm Water Permit or the Clean Water Act occurring or arising after the Effective Date of this Agreement.

43.    The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

The Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from or related to the allegations, matters, and claims as set forth in the 60-Day Notice for storm water pollution discharges at the El Cajon Facility and/or this Consent Decree up to and including the Termination Date of this Agreement, except in connection with the Formal Dispute Resolution Process related to violations or breaches of this Agreement.

/ / /

## VIII.   **MISCELLANEOUS PROVISIONS**

44.   <u>No Admission of Liability</u>. Neither this Agreement, nor the implementation of additional BMPs, nor any payment pursuant to the Agreement shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation.  Defendant maintains and reserve all defenses they may have to any alleged violations that may be raised in the future.

45.   <u>Construction</u>. The language in all parts of this Agreement shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

46.   <u>Choice of Law</u>. The laws of the United States of America and of the State of California for state law questions shall govern this Agreement.

47.   <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

48.   <u>Correspondence</u>. Unless specifically provided for in this Consent Decree, all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:


<u>If to Plaintiff Coastkeeper:</u>

San Diego Coastkeeper

Attn: Matt O'Malley

2825 Dewey Rd, Suite 207

San Diego, CA  92106

Email: matt@sdcoastkeeper.org

/ / /

/ / /

/ / /

If to Plaintiff CERF:

Coastal Environmental Rights Foundation

Attn: Sara Kent

1140 South Coast Highway 101

Encinitas, CA  92024

Email: sara@cerf.org


With Copy to:

Coast Law Group LLP

Attn: Livia Beaudin

1140 South Coast Hwy 101

Encinitas, CA  92024

Email: livia@coastlawgroup.com


If to USA Waste of California, Inc:

Bill Bixler

Senior District Manager

USA Waste of California, Inc.

(619) 596-5183

BBixler@wm.com


With Copies to:

Catherine Riegle Finley, Esq.

Senior Legal Counsel

USA Waste of California, Inc.

(818) 252-3141

CRiegle@wm.com

/ / /

49.     Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or communication by electronic mail.   Any change of address or addresses shall be communicated in the manner described above for giving notices.

50.     <u>Effect of Consent Decree</u>. Except as provided herein, Plaintiffs do not, by their consent to this Consent Decree, warrant or aver in any manner that Defendant's compliance with this Consent Decree will constitute or result in compliance with any federal or state law or regulation.   Nothing in this Consent Decree shall be construed to affect, limit, or increase in any way the obligation of Defendant to comply with all federal, state, and local laws and regulations governing any activity required by this Consent Decree.

51.     <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.   Telecopy, email of a .pdf signature, or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

52.     <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties.

53.     <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

54.     <u>Integration Clause</u>. This is an integrated Consent Decree.   This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

55.     <u>Authority of Counsel</u>. The undersigned representatives for Plaintiffs and Defendant each certify that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

/ / /

56.    Authority of Parties. Each Party certifies that its undersigned representative(s) is fully authorized to enter into this Consent Decree, to execute it on behalf of that Party, and to legally bind that Party to the terms of this Consent Decree.

57.    The Parties, including any successors or assigns, agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

**IN WITNESS WHEREOF**, the undersigned have executed this Consent Decree as of the date first set forth below.


APPROVED AS TO CONTENT


Dated:      2/13/2020          By:    /s/Catherine Stiefel

Name: Catherine Stiefel

Title: Board President

San Diego Coastkeeper


Dated:      2/20/2020          By:    /s/Sara Kent

Name:        Sara Kent

Title: Programs Director

Coastal Environmental Rights Foundation


Dated:      2/11/2020          By:    /s/Larry Metter

Name:        Larry Metter

Title: President Southern California area

USA Waste of California, Inc.

/ / /

/ / /

/ / /

APPROVED AS TO FORM

Dated:      2/20/2020          By:   /s/Livia Borak Beaudin
                                     Livia Borak Beaudin
                                     Coast Law Group LLP
                                     Attorneys for CERF

Dated:      2/24/2020          By:   /s/Matt O'Malley
                                     Matt O'Malley
                                     Attorney for San Diego Coastkeeper

Dated:      2/11/2020          By:   /s/Catherine Riegle Finley
                                     Catherine Riegle Finley
                                     Attorney for USA Waste of California, Inc.

**IT IS SO ORDERED.**

Dated:  April 15, 2020

Hon. Janis L. Sammartino
United States District Judge

27

20-CV-233 JLS (WVG)

<u>**Exhibit A**</u>

- **Good housekeeping and exposure minimization BMPs:**

  1. Transfer Station
     - Staff will be educated to store deposited material (e.g., solid waste, green waste, etc.) within the building under cover at all times unless operationally infeasible.
     - If material cannot be stored under cover, tarps will be placed over material during precipitation events when feasible.
     - Increased sweeping around the area when necessary.
     - Rumble strips will be maintained at the exit to minimize material tracking from the site.
  2. Buy-back Center Area
     - Recyclables will be stored indoors and/or covered bins when feasible.
     - Staff will be educated to minimize loading of recyclable material during rain events.
  3. Tire Storage
     - Tires will be stored under roof.
     - Staff will be educated to minimize loading of tires during rain events.
  4. The existing infiltration basins/bioswales at SW-1, SW-5, and SW-9 will be maintained.
  5. Collection Vehicle Parking
     - Collection Vehicles will be adequately maintained.
     - Windshield washer buckets will be covered and/or stored indoors during rain events.
  6. Wash Rack / Bin Cleaning
     - Staff will be educated to maintain existing berms and curtains to contain and convey wash water to the sanitary sewer.
  7. Bin Storage
     - Bins will be stored on their sides or covered to minimize rainwater exposure, minimize deterioration, and cleaned to the extent possible.

- **Structural BMP Feasibility Evaluations:**

  1. Offsite discharge to MS4 and/or flood control channel
     - Evaluate the potential to treat industrial stormwater, including associated infrastructure such as pump stations and equalization storage.
     - Evaluate cost and potential implementation schedule.
  2. Offsite discharge to sewer
     - Evaluate the potential for the City of El Cajon to accept industrial stormwater discharges into the sanitary sewer collection system, including

associated infrastructure such as pump stations and equalization storage, to meet the sanitary discharge rate requirement.

- Evaluate cost and potential implementation schedule

3. Infiltration
   - Evaluate the potential to infiltrate industrial stormwater at outfalls where this may be feasible, including associated infrastructure such as pump stations and equalization storage
   - Evaluate cost and potential implementation schedule

4. For each alternative, evaluate the feasibility of segregating non-industrial stormwater (e.g., employee parking areas, rooftops, etc.)



**LEGEND**

- ● STORMWATER DISCHARGE LOCATION AND COMPLIANCE MONITORING LOCATION
- ● STORMWATER DISCHARGE LOCATION
- – – PROPERTY BOUNDARY
- – – DRAINAGE AREA BOUNDARY
- → SURFACE WATER FLOW DIRECTION
- → STORMDRAIN PIPE AND FLOW DIRECTION
- ■ STORM DRAIN WITH DRAIN INLET PROTECTION
- ● DOWNSPOUT
- ▨ OIL-WATER SEPARATOR
- – – CONCRETE WALL
- ▨ PORTA POTTIE
- ⊕ HYDRANT
- ▨ NON-INDUSTRIAL AREA
- – – BERM OR CURB
- CONCRETE DITCH
- — INFILTRATION BASIN/BIOSWALE

1. COLLECTION VEHICLE PARKING
2. BIN AND TOTER STORAGE
3. EMPLOYEE PARKING
4. MAINTENANCE BUILDING 1
5. AST OIL STORAGE
6. HAZARDOUS MATERIALS STORAGE
7. SCALE HOUSE
8. C & D TIPPING
9. RECYCLABLES MSW TRANSFER
10. COVERED GLASS CONTAINER
11. TRANSFER TRUCK TURNAROUND
12. DIESEL FUEL DISPENSERS
13. BUY-BACK CENTER
14. AST: 3 - 15,000 GAL. LNG TANKS
15. MAINTENANCE BUILDING 2
16. WASH RACK
17. PAINT BOOTH
18. PARTS AND EQUIPMENT STORAGE
19. OIL-WATER SEPARATOR

NOTES:

1. SERVICE LAYER CREDITS: SOURCE: GOOGLE EARTH, VIA QGIS-OPENLAYERS-PLUGIN.

2. COORDINATE SYSTEM: NAD83 CALIFORNIA STATE PLANES, ZONE VI, US FOOT.

3. ORIGINAL SITE MAP CREATED BY GOLDER ASSOCIATES IN 2014. MINOR SITE MAP REVISIONS PERFORMED BY GEOSYNTEC IN DECEMBER 2019.

0     100'
SCALE IN FEET

SITE PLAN
STORMWATER POLLUTION PREVENTION PLAN
EL CAJON HAULING AND
EL CAJON TS/TRANSFER AND RECYCLING
1001 WEST BRADLEY AVENUE, EL CAJON, CA

**Geosyntec** consultants

FIGURE 3

PROJECT NO: LA0555     JANUARY 2020

N:\CAD\CAD\WWASTE MANAGEMENT\LA0429BEL CAJON\FIGURES\EL CAJON_SITEMAP - Last Saved by: SBerdy on 1/15/20